UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                       Case No. 22-cr-20351

vs.

                                                               HON. MARK A. GOLDSMITH

HENRY LEE SMITH, JR.,

        Defendant.
_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S (1) MOTION FOR FRANKS HEARING (Dkt. 22),**
**AND (2) MOTION TO SUPPRESS (Dkt. 17)**

Defendant Henry Lee Smith Jr. is charged with felon-in-possession of a firearm, possession of a controlled substance, and possession of a firearm in furtherance of a drug trafficking crime. In his motion for a hearing under Franks v. Delaware, 438 U.S. 154 (1978) (Dkt. 22) and motion to suppress (Dkt. 17), Smith challenges the search warrant pursuant to which contraband was recovered from a residence where surveillance established Smith's ongoing presence. For the reasons that follow, the Court denies Smith's motions.[1]

**I. BACKGROUND**

On June 16, 2022, Magistrate Judge Kimberly Altman signed a warrant allowing the Bureau of Alcohol, Tobacco, Firearms and Explosives within the United States Department of Justice (ATF) to search residential premises located on Grantour Court in Pontiac, Michigan. See Search Warrant (Dkt. 17-1). The warrant application included the affidavit of ATF Special Agent

---

[1] The Court held a hearing on Smith's motions on December 21, 2022. In addition to Smith's motions, the briefing includes the Government's responses to his motion to suppress (Dkt. 25) and to his motion for a Franks hearing (Dkt. 28).

1

Brett J. Brandon. See id. at PageID.049–66. In that affidavit, Brandon set forth facts in support of the Government's theory that Smith—who is prohibited from possessing firearms as a felon—likely participated in a drive-by shooting, retained firearms in a secure possession following the shooting, and was residing at the Grantour Court premises, which established probable cause for a search of that location.

### A. Shooting in Pontiac from Inside White Dodge Ram

Brandon's affidavit identified evidence that a drive-by shooting occurred before about 8:00 p.m. on the evening of May 15, 2022 during a memorial service near Raeburn Street and Woodward Avenue in Pontiac. See id. at PageID.52–53. Initial evidence included (i) a caller's report to the Oakland County Sheriff's Department of having heard approximately 15 gunshots in that area, and (ii) the recovery by the Sheriff's Department of fired cartridge casings and broken glass in front of 133 Raeburn Street at about 8:30 p.m. Id.

Additional evidence indicated that participants in the shooting had perpetrated the crime from inside a white Dodge Ram. A tenant residing in a nearby building informed the Sheriff's Department that a white Dodge Ram had driven away from the scene at high speed at the time of the shooting. Id. at PageID.53. Further, an informant told the Sheriff's Department that the informant had observed Smith himself firing shots from a white Dodge Ram. Id. at PageID.53–54.

Brandon attested that surveillance footage from downtown Pontiac—approximately one and a half miles from the scene of the shooting—depicted Smith exiting a white Dodge Ram near an alley at 7:49 p.m. on May 15, 2022. Id. at PageID.54. Surveillance footage showed that the vehicle then proceeded to drive to another street, where the driver exited the vehicle with blood visible on his back and walked in the direction of McLaren Oakland Hospital. Id. This individual

2

reported to McLaren Oakland Hospital in Pontiac with gunshot wounds at approximately 7:57 p.m., claiming not to remember anything about the shooting. Id. at PageID.52.

ATF and the Sheriff's Department later recovered a white Dodge Ram from an address approximately one mile from the shooting. See id. at PageID.56–57. The Dodge Ram had several bullet holes, including one that was consistent with a shot originating from inside the vehicle. Id. at PageID.56–57. Ballistic evidence indicated that at least four firearms were used in the shooting, and ATF determined that cartridge cases found in the driveway next to the Dodge Ram's driver's side door were likely fired from one of those firearms. Id. at PageID.53, 57.

### B. Surveillance Footage of Smith Following Shooting

Brandon also described separate surveillance footage that captured Smith running down an alley at 7:49 p.m. Id. at PageID.54. As described by Brandon, the footage showed Smith "us[ing] his left hand to retrieve a dark colored object from his left pocket/waistband area," leaning out of view of the camera, and then walking away. Id. at PageID.54–55. The affidavit includes two screenshots of this footage, showing Smith walking down the alley. Id. at PageID.55.

Brandon further described surveillance footage from that same alleyway at about 10:36 p.m. on the same night, when Smith returned to the alley, disappeared out of view, and then visibly "used his right hand to place a black 'L' shaped object, consistent with the shape of a pistol, in his right pocket/waistband area." Id. at PageID.55–56. The affidavit includes two more screenshots depicting Smith walking down the alley. Id. at PageID.56.

3

### C. Surveillance of Smith's Phone and Media Presence

ATF obtained federal search warrants to trace the location of Smith's phone. Id. at PageID.59.[2] As the affidavit explains, GPS ping data "cannot locate a specific phone at a specific location"; rather, the information "only provides an area, covered by a particular cellular tower, where a phone is located." Id. at PageID.60. The affidavit states that, during the "overnight hours" from May 15 through June 3, 2022, "SMITH's phone connected to a cellular tower that served the area that included" the Grantour Court residence. Id. at PageID.59.

The affidavit further notes that Smith posted a picture of himself on Facebook wearing a black pistol around his neck on June 1, 2022. See id. at PageID.57–58.

From June 3 through June 14, 2022, Smith's phone data indicated that his phone was not in the area that included the Grantour Court residence; rather, it was in Rockwood, Tennessee. Id. at PageID.59. From about 10:30 p.m. on June 14 through June 15, the data indicated that Smith's phone was back in Pontiac, Michigan, consistent with Smith being present at the premises ultimately subject to the search warrant. Id. at PageID.60.

### D. Physical Surveillance of Grantour Court Residence

ATF conducted physical surveillance of the Grantour Court residence beginning on the morning of June 15, 2022. Id. Brandon observed a shirtless Smith standing inside the front door with the door open. Id. During daytime breaks in physical surveillance, phone data indicated that

---

[2] Specifically, ATF received authorization for use of a Pen Register/Trap and Trace, E-911 and geolocation information, call detail records, and a Cell Site Simulator or Wi-Fi Geolocation Device. Search Warrant at PageID.59. ATF determined that the traced phone belonged to Smith based on queries to two law enforcement databases—Accurint for Law Enforcement and TLO— as well as Oakland County Jail call records involving the phone that included personal details about Smith. Id. at PageID.58–59. Smith does not deny that the traced phone belongs to him.

Smith's phone left the Grantour Court residence but remained in Pontiac. Id. at PageID.61. Later on June 15, fixed video surveillance showed the following:

> At approximately 4:41 p.m., SMITH exited the front door of the Subject Premises [Grantour Court residence] wearing a white t-shirt and multicolored shorts. At approximately 4:47 p.m., SMITH returned to the Subject Premises carrying a black grocery bag and holding a cellular phone. SMITH was let in by an older black female who retrieved the mail from the mailbox.

Id. at PageID.61–62.

According to the affidavit, surveillance showed that Smith left the Grantour Court residence shortly after this appearance, and he returned through the front door at approximately 3:30 a.m. on the morning of June 16, 2022. Id. at PageID.62. Brandon's affidavit then states:

> Between 9:15 a.m. and 11:15 a.m., SMITH entered and exited the Subject Premises numerous times. On multiple occasions, he entered the Subject Premises without a key or knocking on the front door. During this time period, SMITH was observed wearing two different sets of clothing. Based on this surveillance, SMITH appears to maintain different clothing at the Subject Premises.

Id.

### E.  Brandon's Opinion

On the basis of his "training and experience," Brandon then opined in his affidavit that individuals who are prohibited from possessing firearms "rarely discard them," and instead "store those firearms in secure locations like homes and vehicles, or on their persons so that the firearms are easily accessible." Id. at PageID.63–64. He interpreted the alleyway footage as indicating that Smith hid firearms in the alley and then returned there to retrieve them. Id. at PageID.63. He concluded that probable cause existed that Smith resided at the Grantour Court location and that the Grantour Court residence likely contained fruits, instrumentalities, and evidence of federal crimes, including firearms retained by Smith. Id. at PageID.65–66. Brandon's experience

included his participation in over 100 criminal investigations involving the possession of firearms, drug trafficking violations, and criminal street gangs. Id. at PageID.49.

### F. Execution of Search Warrant and Subsequent Charges

The Government represents that ATF executed the search warrant on June 22, 2022. Resp. to Mot. to Suppress at 9. At the Grantour Court residence, ATF seized a rifle, a pistol, a shotgun, and a suitcase containing (i) dozens of rounds of multi-caliber ammunition, (ii) approximately 427 gross grams of methamphetamine worth approximately $10,000, and (iii) a fake Tennessee driver's license with Smith's face but someone else's name. Id. at 9–10. Smith's mother, who lived at the Grantour Court residence, told ATF that the firearms and suitcase belonged to Smith. Id. at 10.

Smith is charged with (i) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a), (b)(1)(B)(viii); (ii) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (iii) felon-in-possession of a firearm in violation of 18 U.S.C. §922(g)(1). See Compl. (Dkt. 1).

## II. ANALYSIS

Smith challenges the search warrant for the Grantour Court residence in his motion for a Franks hearing and his motion to suppress. The Court addresses each motion in turn.

### A. Motion for Franks Hearing

Smith moves for a hearing under Franks to challenge the issuance of the warrant, asserting that Brandon misrepresented the contents of the alleyway surveillance footage. To be entitled to a hearing pursuant to Franks, a defendant must "1) make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) prove that the false statement or material

omission is necessary to the probable cause finding in the affidavit." United States v. Bateman, 945 F.3d 997, 1008 (6th Cir. 2019) (punctuation modified). A defendant presenting this challenge "bears a heavy burden." Id. "Allegations of negligence or innocent mistake are insufficient." Franks, 438 U.S. at 171.

The Court addresses each factor in turn and finds that Smith cannot prevail on either of the two Franks elements.

    i.    **False Statements Made Knowingly and Intentionally or Recklessly**

Smith submits that the first Franks factor is satisfied because Brandon made "false statements . . . either intentionally or with reckless disregard for the truth" when he identified the object seen in the alleyway surveillance footage as a firearm. Br. in Supp. Mot. for Hr'g at 9. In Smith's view, Brandon's description was not "'truthful'" because Brandon could not have "'believed or appropriately accepted as true'" his statement that Smith was seen with a gun in his hand. Id. at 8 (quoting Franks, 438 U.S. at 165). Smith also represents that "Brandon's description of the videos constituted the only information in the affidavits regarding the content of the videos," as the magistrate judge was not presented with the original surveillance footage. Id. at 8–9 (emphasis in original).

The Government argues that Brandon's identification of the unknown object as a firearm reasonably relies on evidence including the surveillance footage, as well as "'common-sense conclusions about human behavior,'" to conclude that Smith hid a firearm in the alley. Resp. to Mot. for Hr'g at 1 (quoting United States v. Smith, No. 21-1457, 2022 WL 4115879, at *3 (6th Cir. Sept. 9, 2022) (affirming denial of motion to suppress) (punctuation modified)). The Government also submits that Brandon "clearly believed that Smith hid a gun in the alley," and

7

Smith cannot demonstrate that this conclusion represented a reckless disregard for the truth. Id. at 12.

Smith points to three supposedly false statements. The Court agrees with the Government that Smith has failed to demonstrate that these statements were false or that Brandon knowingly or recklessly misrepresented the truth.

Smith takes issue with the first paragraph of the affidavit's executive summary: "[s]urveillance video revealed that, after the shooting, SMITH hid the firearms in an alley in Pontiac." Search Warrant at PageID.50. Smith argues that he was "never seen on video with a firearm." Br. in Supp. Mot. for Hr'g at 8. Smith's counsel further argued at the motion hearing that this initial description potentially misled the magistrate judge into concluding that the ambiguous image captured by the surveillance footage could definitively be found to be a firearm.

The Government submits that Brandon's identification of the dark object as a firearm in the executive summary of his affidavit merely "summarized what the facts of the affidavit would establish." Id. at 12. The Court agrees. The instant case is much like Bateman, where the court rejected the defendant's argument that an affidavit's "general descriptions" of a website—which law enforcement had concluded operated to advertise child pornography—could have "misled" the magistrate judge into believing that such advertisements were "explicit" when the advertising element was only implicit. 945 F.3d at 1009. The United States Court of Appeals for the Sixth Circuit found that the defendant had "fail[ed] to demonstrate any showing of falsity or material omission," instead viewing these isolated statements about the website as "summary descriptions . . . operating as general backdrop paragraphs in which to contextualize" law enforcement's investigation. Id. Brandon's statement here was similarly a contextualizing summary that was neither misleading nor false.

A second challenge centers on Brandon's statement that the 7:49 p.m. video shows Smith "use[] his left hand to retrieve a dark colored object from his left pocket/waistband area." Search Warrant at PageID.55. Smith considers this characterization "verifiably false," as "the surveillance video shows no image of any object." Br. in Supp. Mot. for Hr'g at 8. The Court disagrees. The surveillance footage captures Smith walking down an alley following the shooting, looking behind him twice, reaching into his left pocket or waistband while pulling up his shirt, leaning out of view of the camera with his leg raised, and then departing the alley. See Def. Ex. B at 0:11–0:48.[3] A blown-up still-shot provided by the Government shows that Smith did indeed hold a dark object in his hand. Resp. to Mot. for Hr'g at 5. Brandon's statement was not false.

The third challenge is to Brandon's statement that the 10:36 p.m. video shows Smith "retrieve[] the suspected firearms," Search Warrant at PageID.59. Smith submits that "the video itself shows only a dark, indiscernible object." Br. in Supp. Mot. for Hr'g at 8. The Court disagrees that Smith has identified any false statement. The footage shows Smith looking behind him, approaching the same spot where he had stood earlier, leaning out of view of the camera with his leg raised, placing what appears to be a dark object in his pocket or waistband with his right hand, pulling his sweatshirt over his waist, and then leaving the alley. See Def. Ex. C. at 0:05–1:25. From that footage, the Government provided at the motion hearing a blown-up shot of the dark object in Smith's hand, which is consistent with Brandon's description of "a black 'L' shaped object, consistent with the shape of a pistol," Search Warrant at PageID.56. See Resp. to Mot. for Hr'g at 6–7. The affidavit itself included still-shots of the surveillance footage, clarifying for the magistrate judge the precise basis for the affiant's interpretations. See Search Warrant at

---

[3] Smith filed the surveillance footage that captures the alley in the traditional manner, so these exhibits are not available on the docket. See Def. Ex. B; Def. Ex. C.

9

PageID.55–56. Smith has failed to show that Brandon made any false statement in expressing his conclusion that the object was a firearm.

Even if any statement made might be viewed as inaccurate, Smith has not demonstrated that the affiant made the challenged statements while "subjectively entertain[ing] serious doubts as to the truth of his or her allegations." Bateman, 945 F.3d at 1008 (punctuation modified). The Court has no reason to doubt that Brandon believed the conclusion he expressed was correct. If he was incorrect, his error was no more egregious than "negligence or innocent mistake," which is insufficient to satisfy the first element of the Franks inquiry. Franks, 438 U.S. at 171.

Smith cannot prevail on the first prong of the test for a Franks hearing.

### ii. Necessity of Challenged Statements to Finding Probable Cause

Smith also fails to establish the second Franks prong. To prevail, he must show that—absent the statements about the surveillance footage that he attacks—probable cause to believe Smith committed a crime is lacking. See Bateman, 945 F.3d at 1008. Smith asserts that the challenged conclusions about the surveillance footage are the only evidence linking Smith to the shooting except for the statement of an anonymous tipster—i.e., the informant who told law enforcement that he had seen Smith participate in the shooting from a white Dodge Ram. Br. in Supp. Mot. for Hr'g at 9–10. Smith submits that little persuasive value should be granted to a tipster of unknown reliability who has provided only sparse detail. Id. at 10–11. Smith argues that, without the anonymous tip, the remainder of the affidavit can establish only "that a shooting occurred, that Mr. Smith hid and retrieved an unknown object in an alley, and that Mr. Smith and [the driver of the white Dodge Ram] may have been together in the same White Dodge Ram when [the driver] was shot." Mot. for Hr'g at 12.

The Government observes that, even if the surveillance footage is inconclusive as to whether or not Smith was hiding a firearm—and even if the reliability of the tipster who identified Smith as a participant is questionable—other evidence implicates Smith in the shooting. Resp. to Mot. for Hr'g at 17–19. This evidence includes other witness reports and firearm analysis linking a white Dodge Ram to the shooting, paired with the fact that Smith was captured exiting a white Dodge Ram after the shooting occurred and before he hid something in an alleyway. Id.

The affidavit contains sufficient evidence to link Smith to the shooting, even if the Court were to discount Brandon's conclusions about the surveillance footage challenged by Smith. See Bateman, 945 F.3d at 1008. The informant's assertion that Smith participated in the shooting finds corroboration in video evidence placing Smith in the vehicle that reportedly fled from the scene and that was found with bullet holes and cartridge cases linked to the crime. Search Warrant at PageID.54, 56–57. The Government has more than enough evidence for probable cause to believe that Smith committed a crime, even if the Court were to disregard Brandon's conclusion that Smith hid a firearm.

The Court denies Smith's motion for a Franks hearing.

**B. Motion to Suppress**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When presented with an application for a search warrant supported by an affidavit, a magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The affidavit "must state a nexus between the place to be

searched and the evidence sought." United States v. Williams, 544 F.3d 683, 686 (6th Cir. 2008) (punctuation modified).

"[G]reat deference" is given to a magistrate's decision to issue a warrant, which should be reversed only if the magistrate's discretion was "arbitrarily exercised." United States v. Terry, 522 F.3d 645, 647–648 (6th Cir. 2008) (punctuation modified). A district court's review of a magistrate judge's finding of probable cause is limited "only to the four corners of the affidavit." United States v. Abernathy, 843 F.3d 243, 249 (6th Cir. 2016) (punctuation modified).

Further, even if a magistrate judge acts arbitrarily in issuing a warrant, evidence seized pursuant to that warrant should not be suppressed if "the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he [or she] issues [is] objectively reasonable." United States v. Leon, 468 U.S. 897, 922 (1984).

Smith argues that (i) the search warrant failed to establish a sufficient nexus between the residence and the suspected criminal activity or evidence to be seized, see Mot. to Suppress at 7–10, and (ii) the Leon exception does not apply, id. at 10–12. The Court finds that both of these arguments lack merit.

i. **Nexus Between Grantour Court Residence and Smith's Suspected Criminal Activity**

Smith submits that his "mere presence" at the Grantour Court residence is insufficient to establish a nexus to Smith's alleged criminal activity creating probable cause for a search of that location. Id. at 7. In his view, the facts alleged in the affidavit "'failed to reference any criminal activity in relation to' the address to be searched." Id. at 9 (quoting United States v. Norwood, 989 F. Supp. 2d 570, 575 (E.D. Mich. 2013) (granting motion to suppress evidence seized from defendant's residence where that residence's only connection to alleged criminal activity was likelihood that two other individuals associated with defendant—but not defendant himself—had

12

committed murder)). Smith argues that the affidavit failed to establish that the Grantour Court residence was a secure place for Smith to store contraband firearms; rather, the affidavit demonstrated no more than that Smith was "an overnight houseguest." Id. at 10.

Conversely, the Government argues that there was a sufficient nexus between the Grantour Court location and the firearms allegedly in Smith's possession based on (i) phone data establishing Smith's presence at the residence; (ii) physical surveillance locating him at that address within 24 hours of authorization of the warrant and demonstrating that "Smith went in and out of the residence, changed his clothes while in the residence, and repeatedly traveled to and from the residence"; and (iii) Brandon's training and experience in support of the conclusion that Smith likely kept firearms at that location. Resp. to Mot. to Suppress at 8–9, 17–18. As to the last consideration, the Government is correct that a court "may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." United States v. Bethal, 245 F. App'x 460, 465 (6th Cir. 2007) (punctuation modified).

Smith cites case law establishing that an individual's suspected criminal activity is insufficient to create a nexus to that individual's residence in the context of drug crimes.[4] The

---

[4] See Mot. to Suppress at 8 (citing United States v. Brown, 828 F.3d 375, 382 (6th Cir. 2016) (finding that evidence that a defendant was involved in a heroin drug conspiracy was insufficient to conclude there was a nexus between the suspected criminal activity and the defendant's residence where "the search warrant affidavit contained no evidence that [defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there"); United States v. McPherson, 469 F.3d 518, 524–525 (6th Cir. 2006) (finding that fact that officers found drugs in pockets of defendant arrested outside residence was insufficient to establish a nexus between the residence and criminal activity, explaining: "A suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause.") (punctuation modified); United States v. Frazier, 423 F.3d 526, 533 (6th Cir. 2005) (rejecting "proposition that the defendant's status as

13

Sixth Circuit, however, has explicitly distinguished the probable cause inferences that can be made in the context of drug crimes from those that can be made in the context of crimes involving firearms. "Unlike drugs, guns . . . are objects that generally remain in the suspect's possession after commission of the crime, and therefore it is reasonable to believe those possessions to be stored at the suspect's residence, absent evidence to the contrary." Peffer v. Stephens, 880 F.3d 256, 273 (6th Cir. 2018). For this reason, "[i]t is clear that the use of a gun in the commission of a crime is sufficient to establish a nexus between the suspected criminal's gun and his residence." Id. at 272. Consistent with this principle, the Government cites several cases finding probable cause for the searches of residences of individuals suspected of gun crimes based on the opinions of experienced law enforcement agents and the understanding that prohibited individuals retain firearms in secure locations.[5]

---

a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home," though affirming denial of motion to suppress under Leon)).

[5] See Resp. to Mot. to Suppress at 13–16 (citing United States v. Goodwin, 552 F. App'x 541, 546 (6th Cir. 2014) (finding sufficient nexus between firearm and defendant's known residence based on "the value of the machine gun, [defendant's] statement that 'he intended to keep the Ruger machine gun,' and [agent's] experience that owners usually keep machine guns in their homes"); United States v. Vanderweele, 545 F. App'x 465, 469 (6th Cir. 2013) (finding probable cause to search defendant's permanent residence, though silencer had not been seen at that residence, where agent's "affidavit stated that [agent] was aware, based on his training and experience, 'that firearms, ammunition, and related items are commonly stored within the owner or possessor's dwelling'"); Williams, 544 F.3d at 688 (finding sufficient nexus between handguns and residence to support probable cause, stating: "Given the evidence that [defendant] possessed multiple guns, and had recently used them to further his criminal activity, the issuing judge could have reasonably inferred that [defendant] kept at least one handgun at his residence."); United States v. Bland, No. 18-CR-20555, 2018 WL 6171609, at *2 (E.D. Mich. Nov. 26, 2018) (finding sufficient nexus between firearm and defendant's residence, noting that law enforcement agent's conclusion that firearms were likely kept there was "based on her training and experience investigating firearms violations as a police officer for nine years")); see also United States v. Moss, No. 22-20086, 2022 WL 16716147, at *2 (E.D. Mich. Nov. 4, 2022) (denying motion to suppress because, "under the totality of circumstances and caselaw in this circuit, the magistrate could have reasonably inferred that [defendant] kept the handgun in his residence").

Brandon's affidavit provides sufficient support for the conclusion that the Grantour Court location served, at the very least, as a part-time or temporary residence for Smith. The principles underlying the reasonableness of finding probable cause to search a gun suspect's residence apply in this circumstance—i.e., "the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained." Bland, 2018 WL 6171609, at *2.

It was reasonable for the magistrate judge to rely on Brandon's conclusion that Smith likely stored a firearm used in the suspected shooting at some secure location, especially considering Brandon's rational opinion that Smith hid and then retrieved that firearm from an alley. See Search Warrant at PageID.63–66. Smith's Facebook photograph further indicated that he kept a firearm in his possession. See id. at PageID.57–58.

It was also reasonable to conclude that the Grantour Court location provided a secure and private place for Smith to keep his possessions. The affidavit stated that Smith left and reentered the residence at will over at least an approximate two-day period, sometimes entering without using a key or knocking on the door. Id. at PageID.62. Smith was observed wearing two sets of clothes on the morning of June 16, 2022, indicating that he kept clothing at that location. Id. The cell phone data is of minimal evidentiary value, as Brandon and the Government fail to narrow the phone's location to any particular location; nonetheless, the data is consistent with the theory that Smith resided in the Grantour Court home for about three weeks in the second half of May before returning in mid-June. Id. at PageID.59–60.

A temporary residence—which, at a minimum, is substantiated by the affidavit here—can forge a sufficient nexus to a crime involving firearms to support probable cause. In United States v. Peterson, the suspect in a shooting crime challenged a warrant to search a hotel room where

15

surveillance footage and the hotel's guest information established the suspect's "presence." No. 20-20448, 2022 WL 3230424, at *2 (E.D. Mich. Aug. 10, 2022). The court denied the defendant's motion to suppress, relying in part on the affiant's conclusion that "possessors of firearms . . . frequently stored them in familiar and accessible locations." Id.at *3. The Ninth Circuit made a similar finding as to a suspect's motel room. See United States v. Shields, 708 F. App'x 455, 456 (9th Cir. 2018) (affirming denial of motion to suppress and finding "clear nexus" between motel room and firearms sought by police based on sighting of defendant's girlfriend and alleged accomplice at that location, indicating that defendant was "living there").

There was sufficient evidence in the affidavit to demonstrate a probability that the Grantour Court residence was a "familiar and accessible location[]," Peterson 2022 WL 3230424, at *3, where Smith could expect "access" and "privacy," Bland, 2018 WL 6171609, at *2. The magistrate could properly rely on Brandon's opinion that this home provided a "secure" place where Smith would keep an "easily accessible" firearm. Search Warrant at PageID.63–64. The location was at least as reliable of a residence for the purpose of storing contraband as a hotel or motel room. See Peterson, 2022 WL 3230424, at *3; Shields, 708 F. App'x at 456. Affording the magistrate judge "great deference," the Court cannot find that she "arbitrarily" determined that probable cause was present. Terry, 522 F.3d at 647–648 (punctuation modified). On this basis alone, Smith's motion to suppress must be denied.

### ii. Leon Good Faith Exception

Even if the magistrate judge arbitrarily determined that the affidavit supported a finding of probable cause, the Leon good-faith exception would apply. The Leon exception allows for the admission of seized evidence where "the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the

16

warrant's validity, even if the information provided was not enough to establish probable cause." United States v. Carpenter, 360 F.3d 591, 596 (6th Cir. 2004). "The good-faith inquiry requires examination of the affidavit for particularized facts that indicate veracity, reliability, and basis of knowledge and go beyond bare conclusions and suppositions." McPhearson, 469 F.3d at 526. "Although the good-faith standard is less demanding than the standard for probable cause, the affidavit still must draw some plausible connection to the residence." Brown, 828 F.3d at 385–386.

Smith argues that the Leon good-faith exception does not apply because the affidavit was "'so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable.'" Mot. to Suppress at 10–12 (quoting United States v. Laughton, 409 F.3d 744, 748 (6th Cir. 2005) (finding that Leon exception did not apply where district court considered information known to law enforcement but not included in affidavit)). Smith submits that no reasonable officer could conclude that the "broad inferences" in the affidavit were sufficient to justify a search of a private residence, "the place where the Fourth Amendment's protections are strongest." Id. at 12 (citing Payton v. New York, 445 U.S. 573, 585 (1980) (stating that the "chief evil" deterred by the Fourth Amendment is the physical invasion of the home) (punctuation modified)).

The Government refers the Court to cases where officers reasonably relied on affidavits that drew far more tenuous connections between the evidence sought and the locations searched than the nexus asserted in the affidavit at issue here.[6]

---

[6] See United States v. Higgins, 557 F.3d 381, 391 (6th Cir. 2009) (finding that affidavit lacked probable cause to search apartment where informant of questionable reliability stated that he had purchased drugs outside the apartment, but finding that Leon good-faith exception applied because "the warrant contained a sufficient link between [defendant's] home and drug activity such that a reasonably well-trained officer would not have known that the search was illegal"); United States v. Van Shutters, 163 F.3d 331, 336–337 (6th Cir. 1998) (finding that affidavit lacked probable cause for search of residence where it stated that rooms there were "available" to defendant but

17

The Court finds that it was not objectively unreasonable for officers to rely on an affidavit that (i) asserted facts supporting a finding that Smith had used a firearm in a crime of violence, (ii) articulated an opinion that Smith likely maintained possession of that firearm in a secure location, and (iii) described Smith's behavior indicating that he was residing at the location to be searched. These facts support more than a conclusion that the Grantour Court residence was "available" to Smith; rather, they support a finding that he "frequented the premises," up to the point that he used it as a residence. Van Shutters, 163 F.3d at 336–337 (punctuation modified).

Based on Brandon's conclusion that Smith likely kept contraband at a location where he felt comfortable spending the night and storing spare clothes, officers could in good faith see a "plausible connection to the residence." Brown, 828 F.3d at 385–386. The affidavit provides a "minimally sufficient nexus" to support a "good-faith belief in the warrant's validity." Carpenter, 360 F.3d at 596. The Leon exception would apply even if the affidavit failed to establish probable cause.

---

"neglect[ed] to indicate why the affiant believed that [defendant] himself had any connection with" the residence, but finding that Leon exception applied because affidavit "described the location of the [] Residence with such particularity that a common sense inference is that the affiant visited the premises himself and presumably either observed [defendant] in the residence, or determined through investigation that [defendant] frequented the premises") (punctuation modified, emphasis in original); United States v. Schultz, 14 F.3d 1093, 1097–1098 (6th Cir. 1994) (finding no probable cause for search of safety deposit boxes where agent "did not have anything more than a guess that contraband or evidence of a crime would be found" in that location, but finding Leon exception applied because officer "certainly had probable cause to believe that [defendant] had committed a crime," and "the connection was not so remote as to trip on the 'so lacking' hurdle"); United States v. Savoca, 761 F.2d 292, 297–298 (6th Cir. 1985) (finding that affidavit failed to establish probable cause for search of motel room over 2,000 miles away from site of bank robbery because it "failed to describe the relationship of the persons to the premises and [] did not state how recently the bank robberies had occurred," but finding that Leon exception applied because "a reasonably well-trained officer could have reached the opposite conclusion"); see also United States v. Roach, 582 F.3d 1192, 1204–1205 (10th Cir. 2009) (finding insufficient nexus to establish probable cause for search of defendant's girlfriend's residence, but finding Leon exception applied where affidavit stated that address was defendant's residence).

The Court denies Smith's motion to suppress.

### III. CONCLUSION

For the reasons set forth above, the Court denies Smith's motions for a <u>Franks</u> hearing (Dkt. 22) and to suppress (Dkt. 17).

SO ORDERED.

Dated: January 20, 2023  
      Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge